IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:19-CV-03526-NYW

**SKIBO, INC**., a Colorado corporation,

**ILIA GRETSKIY** and

**LESTER BOGUNOVICH**,

      Plaintiffs,

v.

**SHELTER MUTUAL INSURANCE COMPANY**,

      Defendant.

___

**PLAINTIFFS' AMENDED EARLY MOTION FOR PARTIAL SUMMARY JUDGMENT**
___

      Plaintiffs, SKIBO, INC., a Colorado corporation, ILIA GRETSKIY, and LESTER BOGUNOVICH, by and through the undersigned attorney, move for early partial summary judgment against Defendant, SHELTER MUTUAL INSURANCE COMPANY (hereinafter "Shelter"), and in support thereof, say:

MOVANT'S STATEMENT OF UNDISPUTED FACTS

1. Defendant, Shelter Mutual Insurance Company ("Shelter") insured a single family home located at 12066 East Lake Circle, Greenwood Village 80111 (the "Home"), as a non-owner occupied dwelling, under an insurance policy issued by Shelter, a copy of which is attached to this Motion as Exhibit A (the "Policy").  *See Exhibit A.*

2. The Home is owned by Plaintiffs SKIBO, INC. and Ilia Gretskiy.  *See Exhibit B.*

3. Plaintiff Lester Bogunovich is the sole owner of Plaintiff SKIBO, INC.  *See Exhibit C.*

4. The Policy was issued by Shelter for the benefit of Lester Bogunovich.  *See Exhibit A, Doc. 28-1, Page 2 of 12.*

5. While the Policy was in force, a water supply pipe located on the second floor of the Home froze and burst, causing substantial water damage to the Home (the "Casualty Loss").  *See Exhibit D, Defendant's Answer to Plaintiff's Amended Complaint, Paragraph 16.*

6. When the Casualty Loss occurred, the Home was leased to a tenant (the "Tenant") pursuant to a written lease, a copy of which is attached to this Motion as Exhibit E (the "Lease").  *See Exhibit E.*

7. In accordance with the terms of the Lease, SKIBO, INC. relinquished possession of the Home to the Tenant on or about September 15, 2018.  *See Exhibit E.*

8. The Tenant paid monthly rent due under the Lease for the period during which the Casualty Loss occurred.  *See Exhibit F.*

9. When the Casualty Loss occurred, natural gas and electric utilities were being billed by Xcel Energy to the Tenant.  *See Exhibit G.*

10. A claim under the Policy for the Casualty Loss was timely submitted to Shelter.  *See Exhibit H, Defendant's Admission to Request for Admission No. 7.*

11. Shelter denied the claim for coverage of the Casualty Loss under the Policy by letter, a copy of which is attached to this Motion as Exhibit I.  *See Exhibit I.*

12. Among other grounds, Shelter denied coverage for the Casualty Loss based on the following exclusion contained in the Policy:

    > 11.  Leakage or overflow from plumbing, heating, air conditioning or other equipment or appliances (except fire protective systems) caused by or resulting from freezing while the described building is vacant or unoccupied, unless the insured has made effort to maintain heat in the building or unless the equipment and appliances have been drained and the water supply shut off during such vacancy or unoccupancy.

   *See Exhibit A, Doc. 28-2, Page 5 of 13, and Exhibit I.*

## ISSUE FOR DETERMINATION

If one or more of the Plaintiffs are otherwise entitled to coverage under the Policy for the Casualty Loss, are the terms "vacant or unoccupied" as used in the context of the relevant exclusion in the Policy ambiguous?

## SUMMARY OF ARGUMENTS

1. The terms "vacant or unoccupied" are not defined in the Policy, have multiple meanings that support opposite policy coverage results, and are therefore ambiguous in the context of the relevant exclusion in the Policy.

2. Under generally accepted principles of contract construction, ambiguous terms in an insurance contract must be construed against the insurance carrier, and in favor of coverage for the insured.

3. Public policy considerations support continued encouragement to insurance companies to fully and clearly define the terms in insurance policies that are intended by the insurance company to deny coverage, in order to prevent arbitrary and unpredictable coverage determinations for insureds.

4. In the alternative, provisions of an insurance contract are construed using a "reasonable expectation" of the insured standard, and Shelter's use of the phrase "vacant or unoccupied" without any reference to a time frame, for the purpose of attempting to exclude coverage, does not meet the reasonable expectation of insureds in the context of a non-owner occupied dwelling insurance policy.

## SUMMARY JUDGMENT STANDARD

Summary judgment is properly entered when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Equal Employment Opportunity Comm. v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000); A.W. Interiors v. The Travelers Indem. Co., 44 F.Supp.3d 1071 (D.C. Colo. 2014). When considering whether to enter summary judgment, a Court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  Id.; Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000). The movant bears the burden of demonstrating that no genuine issue of material fact exists. Id. "All doubts must be resolved in favor of finding the existence of triable issues of fact." Boren v. Sw. Bell Tel. Co., 933 F.2d 891, 892 (10th Cir. 1991). A fact is "material" if it could legally affect the outcome of the lawsuit. EEOC v. Horizon/CMS Healthcare, 220 F.3d 1184, 1190 (10th Cir. 2000). A dispute is "genuine" if a fact finder could reasonably find in favor of the nonmoving party on the evidence presented. Id.

LEGAL ANALYSIS

    A.    <u>Principles of Contract Interpretation</u>

In this case, federal jurisdiction is predicated upon diversity. As such, the court must apply the substantive law of the forum state. <u>Barrett v. Tallon</u>, 30 F.3d 1296, 1300 (10th Cir. 1994); <u>A.W. Interiors</u> at 1074. Colorado law is well-established that "[a]n insurance policy is merely a contract that courts should interpret in line with well-settled principles of contract interpretation." <u>Cyprus Amax Minerals Co. v. Lexington Ins. Co.</u>, 74 P.3d 294, 299 (Colo. 2003). When interpreting an insurance policy, courts are prohibited from rewriting provisions and, if possible, should give terms used in the policy their plain and ordinary meaning, unless a contrary intent is evidenced in the policy. <u>Id.</u>; <u>Chacon v. Am. Family Mut. Ins. Co.</u>, 788 P.2d 748, 750 (Colo. 1990). The provisions of the policy should be read as a whole, rather than in isolation. <u>Id.</u>; <u>Simon v. Shelter Gen. Ins. Co.</u>, 842 P.2d 236, 239 (Colo.1992). The Colorado Supreme Court has cautioned that:

> "Courts may neither add provisions to extend coverage beyond that contracted for, nor delete them to limit coverage. However, because of the unique nature of insurance contracts and the relationship between the insurer and insured, **courts do construe ambiguous provisions against the insurer and in favor of providing coverage to the insured.**" (emphasis supplied)

<u>Id</u>. The court's construction of an insurance policy is a matter of law. <u>Id.</u>; <u>Compass Ins. Co. v. City of Littleton</u>, 984 P.2d 606, 613 (Colo.1999).

    B.    <u>Ambiguous Terms Must Be Construed Against an Insurer and in Favor of Coverage for the Insured</u>

At the heart of this dispute is the interpretation of the words "vacant or unoccupied" for purposes of the relevant exclusion in the Policy. The exclusion applies only if the water damage was caused by the freezing of pipes that occurred while the property was "vacant or unoccupied." Those terms are not defined by the Policy. Under standard principles of policy interpretation, the terms "vacant" and "unoccupied" must mean different things. The Court cannot find them to mean the same thing without rendering one of the terms superfluous. <u>Copper Mountain, Inc. v. Industrial Systems, Inc.</u>, 208 P.3d 692, 700 (Colo. 2009) ("We choose a construction of the contract that harmonizes provisions instead of rendering them superfluous."); <u>Rocky Mountain Prestress, LLC v. Liberty Mutual Fire Ins. Co.</u>, 960 F.3d 1255, 1262 (10th Cir. 2020); <u>Residences at Olde Town Square Assoc. v. Travelers Cas. Ins. Co.</u>, 430 F.Supp.3d 743, 752-3 (D. Colo. 2019).

1.  <u>Vacant</u>.

In a home rental context applicable in this case, the term "vacant" generally means the opposite of "rented." When advertising homes for rent, the advertiser often refers to the property as being vacant when there is no tenant currently renting the property. Likewise, motels regularly use the word "vacancy" to indicate that they have a room available for rent. On the other hand, Webster's New World College Dictionary's definition of "vacant" includes having nothing in it, devoid of contents, empty; not held, filled or occupied. (4th Ed., p. 1565). This demonstrates that there are multiple, plain and ordinary meanings to the term "vacant" and compels the conclusion that the term "vacant" is ambiguous in the contest of the relevant exclusion in the Policy.

"Vacant" is most often understood in the home rental context to mean that the Property is not currently being rented to a third party. The Policy was plainly issued to provide coverage for a rental dwelling. *See Exhibit B, top of page 1*. However, if one applies the Webster's definition to "vacant," it would erroneously render that term superfluous with "unoccupied." <u>Copper Mountain</u> at 700. Because the term "vacant" may be reasonably construed to have multiple meanings, it is ambiguous, and the Court must construe the term "vacant" in the exclusion in favor of coverage.

2.  <u>Unoccupied</u>.

There are no Colorado cases that expressly defines the term "unoccupied" in the context of an exclusion for insurance coverage on a non-owner occupied dwelling. As noted above, "unoccupied" must mean something different than "vacant." <u>Copper Mountain</u> at 700. In a home rental context, the term "unoccupied" generally means that a tenant in a rental property has no possessions in the property. Webster's Dictionary however, defines "unoccupied" as having no occupant, vacant, devoid of contents, and empty. (4th Ed. p. 1576). Plaintiffs' contend that, in the rental context, "unoccupied" could mean "devoid of all contents and empty" or it could mean "not rented" because it had no occupant or contents belonging to a tenant, and was vacant, as the definition suggests.

It is anticipated that Shelter will argue that "unoccupied" means "devoid of human presence." However, there is nothing inherent in the numerous definitions of unoccupied that refers to human presence. Even if this somewhat strained definition is used, however, there must be some time element specified to fully understand its meaning. Otherwise, the term is simply ambiguous. It is axiomatic that when tenants living in a rented home go to the grocery store and leave their home "unoccupied" for a period of time necessary to purchase groceries, it is not

considered "unoccupied," even though the home was devoid of human presence during that time period.  Perhaps, however, if they left their home to travel around the world on a year-long cruise, and left no one to care for the home during this period, it might be more persuasively argued that the lack of human presence during this period might cause the home to be considered "unoccupied" during this period, under some definitions, but not others.  Even in this example, however, it could still be argued that the home of the vacationing family was occupied if they left everything they owned at the home, except for the items they packed in their suitcases.  Furthermore, if they asked a neighbor to regularly check on the property in person, the home would not be continuously void of human presence.

These examples, illustrate the principal difficulty in the present context of interpreting what is meant in the Policy by the term "unoccupied"; namely determining what, if any, time frame applies, and exactly where on the time continuum "occupied" suddenly changes to "unoccupied" when a tenant leaves the property for some period of time.  The presence of a tenant's furniture and personal belongings may also independently satisfy the definition of occupying the property, without human presence.  Without further definition that includes some reference to a time frame, however, or requiring some assumptions, it is impossible to determine where on the "property and belongings continuum" the phrase "not occupied" changes to "occupied."  Furthermore, it remains unclear whether lack of human presence is always required, sometimes required, or never required, or even whether it affects the relevant meaning at all.  It is unclear what amount of tenant's furniture, beds, lamps, clothing, and other belongings are sufficient to make a rental property "occupied."

Preventing some other person from occupying a particular property by renting it and taking exclusive possession of it under a lease usually means that the property is occupied, or in this context, not unoccupied.  Unfortunately, the Policy at issue in this case does not provide the clear delineation that it should.  The meaning of these terms, in this context, may reasonably vary from person to person, especially considering whether viewed from the perspective of an insurance company or the perspective of a landlord.

Because of the importance regarding whether insurance coverage applies, as in this case, this decision cannot be left to the whim of the insurance carrier who elects to use undefined terms like "vacant or unoccupied" in its exclusionary policy language.   In this case, Shelter failed to define "unoccupied" in the Policy. It would have been easy enough to do, as a number of other

insurance companies have done so. <u>Gray v. Allstate Indem. Co.</u>, Case No. 3:13-cv-1232, (M.D. Pa. February 23, 2015).

Furthermore, other provisions of the Policy offer no guidance whatsoever to allow a definitive determination with regard to the time period required for a temporary absence of human presence (if necessary at all), or amount of personal belongings left at the property during a temporary absence, that gives rise to the level of making the property "unoccupied." Simply put, there are multiple choices for the definition of "unoccupied" in the context of the Policy, and, in this case, unlimited choices with regard to determining an applicable time frame to use. Under these circumstances, and based on applicable principles of generally accepted contract construction, the term "unoccupied" is ambiguous, because it can never be determined with certainty from the insurance contract itself what time period was intended to apply in the Policy. Thus, because there is no way to tell exactly what was intended by use of the word "unoccupied" from the four corners of the insurance policy contract, especially with no time frame reference, the word "unoccupied" is ambiguous. As such, the court must construe the ambiguous term against Shelter and in favor of coverage. <u>Bailey v. Lincoln General Ins. Co.</u>, 255 P.3d 1039, 1051) (Colo. 2011); <u>A. W. Interiors</u> at 1075.

       3.      <u>Other Jurisdictions Have Persuasively Found These Terms to be Ambiguous</u>

Other jurisdictions have found these terms to be ambiguous. For example, in <u>Carter v. State Farm Fire & Cas. Co.</u>, 407 F. Supp. 3d 780 (S.D. Ind. July 17, 2019), a freezing pipes case, the court found that the words "vacant" and "unoccupied" should be construed in relation to the property and its use.

> "So the words "vacant" and "unoccupied" may have a different meaning in the context of a summer vacation home, just as they have different meaning in the context of an owner-occupied dwelling versus a tenant-occupied dwelling, or when applied to a church, schoolhouse, store, barn, or mill."

<u>Id</u>. at 784. Because the use of the property must be taken into account, the terms may be reasonably construed to mean different things and are therefore, ambiguous.

Another case finding these terms to be ambiguous is <u>Gray v. Allstate Indem. Co.</u>, Case No. 3:13-cv-1232, (M.D. Pa. February 23, 2015). In that case, the rental property sustained vandalism-related fire damage. The policy excluded coverage for fire losses caused by vandalism if the property was vacant or unoccupied for more than 90 consecutive days immediately preceding the vandalism and precluded coverage for any loss occurring while the property was vacant or

unoccupied beyond 60 consecutive days. The insured contended that, although the property was not being rented at the time of the fire, the insured had a continuous presence on the property to personally rehabilitate the property. The Gray court found that the terms "vacant" and "unoccupied" as used in the policy could be reasonably interpreted to support the positions of both parties. Additionally, the court found that Allstate could have eliminated the ambiguity by defining the terms vacant and unoccupied but failed to do so. Consequently, the Gray court found the terms to be ambiguous and strictly construed them against Allstate. See also, Kirkes v. Guideone Mut. Ins. Co., Case No. CIV-07-1345-C *5 (W.D. Okla., February 17, 2009) (where only the word "vacant" was used in the policy, and finding "vacant" to be ambiguous because multiple definitions might be applicable).

C. Public Policy Considerations.

The ambiguity of these terms when used in the context of an exclusion to insurance coverage, without specifying a time frame, or using a clear and workable definition, fosters arbitrary and unpredictable coverage determinations.  Insurance policy terms should be clearly and fully defined in the relevant insurance policy by the insurer.  Doing so will no doubt reduce the burden on the judicial system, by reducing or eliminating disagreements regarding the application of relevant coverage exclusions.

D. Doctrine of Reasonable Expectations

Colorado courts "have long viewed insurance policies with a critical eye." Bailey v. Lincoln Gen. Ins. Co., 255 P.3d 1039, 1049. (Colo. 2011). Although insurance policies are not necessarily contracts of adhesion, neither are they in any sense negotiated at arms-length. Courts recognize that they are often presented on a take-it-or-leave-it basis and obtained by insureds who generally lack the sophistication to scrutinize and comprehend all of the language contained in insurance policies. Id. As with standardized contracts generally, there is an increased risk that the insured will be inadvertently or intentionally exploited. Id. For that reason, courts have a responsibility to scrutinize insurance policies carefully. Id. The doctrine of reasonable expectations is one of the principles of fairness to which insurance companies are subjected to protect insureds from the danger of unfairness or exploitation inherent in standardized contracts. Id.

Although there has been some disagreement on the scope of the doctrine of reasonable expectations, courts do agree that it is an interpretive tool that supplements, but does not supplant traditional principles of contract interpretation. Id. at 1050. One of the circumstances in which the doctrine of reasonable expectations has been invoked in Colorado is "where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue." Id.

> "This manifestation of the doctrine of reasonable expectations applies when policy coverage-provisions may not be ambiguous in the technical sense, and hence subject to the rule that ambiguities must be construed against the drafter, but are ambiguous from the perspective of an ordinary reader. In such cases, exclusionary language may be held unenforceable."

Id. See also Hoang v. Assurance Co. of Am., 149 P.3d 798, 803 (Colo. 2007) ("An insurance policy must be construed to meet the reasonable expectations of the insured.")

It is not uncommon for people to leave their homes for periods of time, whether visiting a grocery store, or on an extended vacation or while visiting a second home in the mountains, or even extensive business travel, but that this does not necessarily mean that their home is "unoccupied."  Some families have two homes and are able to occupy both simultaneously for purposes of maintaining insurance coverage on them, or it is likely that they believe they are able to do so.  Therefore, a rented home is not necessarily "unoccupied" simply because the tenant is not always there.

The doctrine of "reasonable expectations" provides independent support for Plaintiffs' arguments. Given the fact this Policy was issued to provide coverage for a rental dwelling, landlords like the Plaintiffs reasonably expect that coverage will not be denied to them just because a loss occurs when their tenants are absent from the Property for some unspecified period of time. Landlords similarly situated to the Plaintiffs reasonably expect that coverage would not waver depending upon whether their tenant was continuously present.  Tenants have the right to peaceful, exclusive possession of a leased premises. Tenants cannot be required or expected to inform the landlord when they go on vacation or travel for business. Thus, in the context of a Policy for a rental dwelling, once the property is rented and the landlord relinquishes possession of the property to a tenant, landlord's would not expect to lose insurance coverage for a casualty loss that occurs when their tenant temporarily leaves the property, leaves a window open, or perhaps incorrectly sets the thermostat.

It appears that the purpose of the relevant exclusion of the Policy is to alert the insured that they have a higher duty to safeguard the rental property when it is "vacant or unoccupied." To fulfill that purpose, however, the exclusion must be fully understood and easily and consistently applied.  It is reasonable to expect that an exclusion of coverage should create a bright line.  Any use of exclusionary terms that require an insured to keep themselves fully informed about exactly how long, and for what purpose a tenant might be absent from the property, or to routinely inspect a rental property during a tenant's temporary absence, does not meet that standard.  It would be unfair and unreasonable to require a landlord to monitor its tenant's behavior on an hourly, daily, weekly or monthly basis, and would likely constitute a violation of actual or implied covenants of "quiet enjoyment", if a landlord were to do so.

## CONCLUSION

The application of the policy exclusion partially relied on by Shelter to deny insurance coverage to the Plaintiffs in this case depends upon the interpretation of the terms "vacant or unoccupied." Neither term is defined by the Policy and may be reasonably construed to mean a number of things (and cannot be construed to mean the same thing). Accordingly, the terms "vacant and unoccupied" are ambiguous in the context of this insurance policy.  As a result, the Court must interpret the exclusionary of the Policy against the insurer and in favor of coverage. The exclusion related to "vacant or unoccupied" set forth in the relevant exclusionary language in the Policy above should be held unenforceable against the Plaintiffs on this basis.

It is reasonable to expect that terms selected by the insurer for inclusion in the Policy should be clearly delineated when it comes to excluding coverage bargained for by the insured.  Any exclusionary terms that require a "how much is enough" or a "how long is too much" analysis, or requiring unusual and extraordinary actions by a landlord, does not meet this standard.

WHEREFORE, the Plaintiffs respectfully request the court enter partial summary judgment denying enforcement of Shelter's claimed exclusion associated with the terms "vacant or unoccupied" because these terms used in Shelter's Policy are ambiguous as a matter of law, and for such other relief as this court deems appropriate in the circumstances.

Respectfully submitted this 31st day of December, 2020.

/s/ *David M. Summers*
David M. Summers, Esq., No. 13488
4401 South Quebec Street, Suite 100
Denver, Colorado  80237
Phone: (303) 220-5420
E-mail:  dsummerslaw@gmail.com
*Attorney for the Plaintiffs*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 31, 2020, a true and correct copy of the foregoing was served via the Court's ECF electronic filing system to:

Sophia H. Tsai, Esq.
Morgan Rider Riter Tsai, PC
1512 Larimer Street, Suite 450
Denver, CO 80202
Email: stsai@morganrider.com

/s/ *David M. Summers*
David M. Summers # 13488
*Attorney for Plaintiffs*